OPINION
{¶ 1} Megan Patterson was found guilty by a jury in the Montgomery County Court of Common Pleas of involuntary manslaughter, child endangerment, and possession of heroin, arising out of the death of her four-month old son, Dylan Marcum, on July 15, 2004. The jury acquitted Patterson of reckless homicide. Patterson was sentenced to four years of incarceration on the manslaughter and child endangerment offenses, to be served concurrently. She was sentenced to five years of community control sanctions for the possession of heroin offense, to be served upon completion of her imprisonment. Patterson's driver's license was also revoked for six months. Patterson appeals from her convictions and sentences.
 {¶ 1} The state's evidence reveals the following facts.
 {¶ 2} Twenty-year old Megan Patterson and her four-month old son, Dylan Marcum, lived with Patterson's parents in their trailer home located at 2350 Encore Drive in Riverside, Ohio. As of July 11, 2004, Patterson's sister, Sarah, and her three young daughters had also been staying at the residence.
 {¶ 3} At approximately 8:15 a.m. on July 15, 2004, Patterson went outside with Dylan to speak with Amanda Black, her mother's employer, who was giving her mother a ride to work. Patterson stated that she had fed Dylan and was going to give him a bath and put him to bed, as was their normal routine. At that time, Dylan had food on his face and some food on his clothes. Black testified that Patterson looked very tired and had stated that she had been falling asleep trying to feed Dylan.
 {¶ 4} Patterson went back inside and prepared for Dylan's bath. She placed a towel or a blanket on the bottom of the tub for Dylan to lie on and filled the tub a couple of inches so that the water reached just below Dylan's ears as he lay on his back. Patterson washed him and played with him. While Patterson was bathing Dylan, Sarah came into the bathroom. Sarah felt the bath water and thought it was too hot. She let out some of the water and added cooler water to the tub. Patterson stated that she thought the water was too cold. Sarah then left the bathroom. At this point, Patterson either passed out or fell asleep.
 {¶ 5} Shortly before 10:20 a.m., Patterson was awakened by Tim Duncan, a friend who had been staying at the trailer for several days, who was shouting Patterson's name. Patterson looked up and saw Dylan floating face down in the water. She picked him up and ran to the living room with him while Duncan called for Sarah to call 911. At approximately 10:20 a.m., the Riverside fire department was dispatched on a 911 call for "difficulty breathing"; an additional message stated that an infant had drowned in a bathtub. The Riverside police department was also dispatched. Within minutes, Anne Wood, a paramedic with the Riverside Fire Department, and the Fire Chief arrived. Wood observed Patterson pacing on the sidewalk outside the trailer. When Wood got out of her vehicle, Megan said "help him" or "save him" and told Wood that Dylan was inside. When Wood entered the trailer, Dylan was lying on the living room floor and Sarah was performing CPR. Wood evaluated Dylan and found that he had no pulse, was not breathing, was very pale, did not respond to verbal or painful stimuli, and was very cold. When the ambulance arrived, Wood picked up Dylan and took him to the vehicle, where the medics began advanced life support, which proved unsuccessful. At this time, Sergeant Matthew Sturgeon of the Riverside Police Department arrived at 2350 Encore Drive to investigate the incident. Dylan was taken to Children's Medical Center where the emergency room trauma team continued resuscitation efforts for approximately five to ten minutes. Dylan was subsequently pronounced dead.
 {¶ 6} During the police investigation of the incident, Sturgeon noticed that the tub in the bathroom was filled to the top with water, the floor in the bathroom was completely saturated and had standing water in certain areas, and the hallway leading to the bathroom went from lightly moist to saturated as it neared the bathroom entrance. Sturgeon also noticed several items of drug paraphernalia in various rooms of the trailer, including two burnt spoons and syringes.
 {¶ 7} After returning from the hospital, Patterson consented to provide a blood sample to the Riverside police, and she was subsequently interviewed twice by Detective Kolby Watson. During those interviews, Patterson admitted to having voluntarily taken heroin by injection and Klonopins (a mild depressant) on July 13, 2004. She further stated that she had taken heroin and crack cocaine on July 14, 2004. Patterson indicated that she had not slept on July 12th or July 13th and had slept only four hours on July 14th. Patterson stated that she had been very tired on July 15, 2004. Testing of the blood sample by the Miami Valley Regional Crime Lab ("MVRCL") revealed that Patterson's serum contained a small amount of morphine, which is a metabolite of heroin, and a trace of cocaine. Patterson was arrested on July 15, 2004, following the second interview.
 {¶ 8} On September 9, 2004, Patterson was indicted for involuntary manslaughter, child endangerment, and reckless homicide. Patterson was also indicted for possession of heroin between July 14 and July 16, 2004. On October 1, 2004, Patterson moved to suppress all of the statements made by her to the police and the blood evidence. After a hearing, the trial court denied the motion. From January 31 to February 2, 2005, she was tried by a jury. She was convicted of three counts, as stated supra, and sentenced accordingly.
 {¶ 9} Patterson raises four assignments of error on appeal.
 {¶ 10} I. "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENTS, WHICH WERE INVOLUNTARY AND TAKEN IN VIOLATION OF HER RIGHTS PURSUANT TO THE FIFTH ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."
 {¶ 11} In her first assignment of error, Patterson claims that the trial court erred in denying her motion to suppress the blood evidence and the statements that she made to the police on July 15, 2004. Specifically, Patterson argues that her consent to the blood draw and her statements were rendered involuntary because of her extreme tiredness due to "the effects of drugs and/or sleep deprivation" and her emotional state due to the death of her baby that morning.
 {¶ 12} During the suppression hearing, the trial court was presented with testimony from Detective Kolby Watson of the Riverside Police Department, who investigated Dylan's death, and from Patterson.[1] According to Watson's testimony, he first made contact with Patterson at approximately 1:00 p.m. on July 15, 2004, after Patterson had returned to her residence from the hospital with her parents. When he approached, he observed that Patterson's eyes were puffy and red underneath, that she was very upset and crying, and that she had a scratchy voice like someone who had been crying. Watson expressed concern for what had happened and explained that he was conducting an investigation. He advised Patterson "that we had some information that she had possibly been using drugs" and he asked her if she would be willing to give blood so the police could test whether she had drugs in her system. Watson first asked Patterson if she could go to either the Miami Valley Hospital or 1010 Woodman Drive to have blood drawn. When Patterson responded that she did not have a ride, Watson offered to drive her. Watson also explained to her that they would stop by the police department so that he could complete some paperwork prior to going to the urgent care center on Woodman Drive "where they would draw blood from her which in turn would be sent to the crime lab." Watson testified that Patterson appeared to understand what was going on and had no questions for him.
 {¶ 13} Patterson got into the front seat of the cruiser; she was not handcuffed. She put on her seat belt and closed the door for herself. As indicated, Watson and Patterson first went to the police department. Patterson was placed in an interview room, with the door left open, in the front of the building. The interview room was ten by ten feet with a chair inside and had a steel door with a window in it. In the meantime, Watson prepared a voluntary blood withdrawal consent form. Watson reviewed the form with Patterson at the police department. Watson also asked Patterson to review the form herself and to sign the form if she agreed to voluntarily give blood. Patterson and Watson both signed the form, as well as Officer Naff, who witnessed the review of the form and the signatures. At this time, Patterson was still upset but was calm and no longer crying.
 {¶ 14} Watson then drove Patterson to the urgent care center at 1010 Woodman Drive. Patterson again sat in the front seat and applied her own seat belt. Upon arriving, Watson and Patterson went to the back of the facility for the blood draw. Watson testified that Patterson was "a little lethargic where you could tell that she was a little tired, but other than that, nothing out of the normal." Paul Skinner, a certified technician, drew Patterson's blood. Skinner and Watson noticed marks on Patterson's arms. Patterson stated to them that she "was not a druggie, but she had used heroin, and the person that was helping her do it wasn't very good at it and they missed her veins a couple of times." Afterwards, Watson drove Patterson back to the Riverside Police Department. Patterson fell asleep in the car. Watson woke her up and asked her if she was ok. Patterson responded that she was extremely tired and had been up all night. She also volunteered that she was not a bad mother but had just fallen asleep.
 {¶ 15} At the police station, Patterson was placed in the same interrogation room while Watson went into the sergeant's office to get some paperwork and a digital recorder. At 2:02 p.m., Watson began to interview Patterson in the sergeant's office, a ten by fifteen foot room that had two desks, a large picture window, and a small round table in the corner with two chairs. He stated that Patterson appeared tired and that her voice was a little crackly, but she did not exhibit any signs of being under the influence of alcohol or drugs. Her voice was not slurred. Patterson's face was still puffy and she was still a little upset, but she seemed cognizant as to time and place, knew where she was, and was able to answer questions.
 {¶ 16} At the beginning of the interview, Watson reviewed pre-interview forms, which contained Miranda warnings, with Patterson. Patterson initialed next to each right and Patterson either nodded or orally stated that she understood as each right was being read to her. Watson explained the crime for which she was being interviewed and why she was being interviewed. Watson asked Patterson to sign the bottom of the form if she was willing to talk to him; Patterson signed the bottom of the form.
 {¶ 17} Watson questioned Patterson for approximately 13-14 minutes. When she started talking about the death of her child, she became very emotional and started crying. Watson stopped the interview "to give her time to emotionally regroup." Watson got Patterson a blanket and some water. He also went to McDonald's and purchased lunch for her. During the break, Patterson went from the sergeant's office to the front interview room by the front lobby. Patterson ate some of her lunch and napped.
 {¶ 18} Watson resumed the interview in the sergeant's office at 3:42 p.m. At that time, Patterson seemed more alert. Watson again reviewed Patterson's Miranda rights with her, using a blank form. Patterson again indicated her understanding of the rights. Watson again asked her to sign the form if she was willing to speak with him, and she signed the form. Although Patterson still appeared tired, she was coherent and did not appear to be under the influence of drugs or alcohol. Patterson was able to relate events occurring a day or two prior. The second interview lasted approximately 30 minutes. Afterwards, Patterson was taken to the front interview room. This time, the door was shut and locked.
 {¶ 19} Patterson likewise testified that she was "quite tired that day" and that she had had five to six hours of sleep in the two days prior to the incident. Patterson stated that when Watson asked her to accompany him, she was feeling "shocked" and "confused" and "it hadn't hit me yet." Her primary feelings at the police department were "sadness, guilty, I felt like it was my fault, I wanted my baby."
 {¶ 20} We begin with Patterson's assertion that she did not voluntarily provide statements to the police. "Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived [her] right to counsel and right against self-incrimination are distinct issues." State v. Eley (1996), 77 Ohio St.3d 174, 178,672 N.E.2d 640; State v. Kelly, Greene App. No. 2004-CA-20,2005-Ohio-305. In order for a defendant's statements made during a custodial interrogation to be admissible, the prosecution must establish that the accused knowingly, voluntarily, and intelligently waived her Fifth Amendment right against self-incrimination. State v. Edwards (1976), 49 Ohio St.2d 31,38, 358 N.E.2d 1051, overruled on other grounds, (1978),438 U.S. 911, 98 S.Ct. 4137, 57 L.Ed.2d 1155; Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
 {¶ 21} Even when Miranda warnings are not required, a defendant's statement may be involuntary and subject to exclusion. Kelly at ¶ 11. "The test for voluntariness under aFifth Amendment analysis is whether or not the accused's statement was the product of police overreaching." State v.Finley (June 19, 1998), Clark App. No. 96-CA-30; State v.Dailey (1990), 53 Ohio St.3d 88, 92, 559 N.E.2d 459, citingMoran v. Burbine (1986), 475 U.S. 412, 421, 106 S.Ct. 1135,89 L.Ed.2d 410. "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."Edwards, 49 Ohio St.3d at paragraph two of the syllabus; seeState v. Brewer (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491;State v. Marks, Montgomery App. No. 19629, 2003-Ohio-4205. Although a defendant's mental state is significant in determining whether a waiver is voluntary, "it alone does not determine voluntariness without some relation to official coercion." Statev. Velez (Mar. 20, 1998), Columbiana No. 96-CO-48; see Eley,77 Ohio St.3d at 178 ("Evidence of police coercion or overreaching is necessary for a finding of involuntariness, and not simply evidence of a low mental aptitude of the interrogee.").
 {¶ 22} Whether a statement was voluntarily given is a question of law, which we review de novo. Arizona v. Fulminante
(1991), 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302;State v. Booher (1988), 54 Ohio App.3d 1, 7, 560 N.E.2d 786. "However, weighing the evidence and determining witness credibility at suppression hearings are matters within the sound discretion of the trial court." State v. Sutphin (June 30, 1999), Greene App. No. 98CA140.
 {¶ 23} Although Watson was aware that Patterson had had minimal sleep over the preceding few days and was clearly upset about the death of her child, there is no evidence that Watson engaged in any "overreaching" such that Patterson's statements were rendered involuntarily. Prior to both interviews at the Riverside Police Department, Patterson was informed of herMiranda rights, and she indicated her understanding of those rights. Patterson did not, at any time, indicate that she did not understand her rights, request to talk to an attorney, or request to stop the interview. Nothing in the description of the sergeant's office, where Patterson was interviewed, suggests that the environment was coercive. Patterson was not denied the opportunity to eat, rest, or "emotionally regroup" when needed. Watson indicated that Patterson did not exhibit any signs of being under the influence of alcohol or drugs, that she spoke clearly, appeared to understand where she was, and was able to answer questions and relate details regarding the previous days. When Patterson became more distraught and began to cry during the first interview, the detective stopped the interview. When the second interview began, Patterson had calmed, eaten some lunch, napped, and appeared more alert. Both interviews were of a short duration. Considering the totality of the circumstances, the evidence amply supports the trial court's conclusion that the police did not engage in overreaching and that Patterson had spoken voluntarily.
 {¶ 24} The parties have not squarely addressed whether Patterson was subject to a custodial interrogation during her interviews with Watson, but the evidence indicates that she was not. Accordingly, Watson was not required to provide Miranda
warnings to Patterson, nor was she required to waive herMiranda rights, in order for her subsequent statements to be admissible. See State v. Biros (1997), 78 Ohio St.3d 426,678 N.E.2d 891; Kelly, supra. However, assuming arguendo thatMiranda warnings were required, the record amply supports the trial court's conclusion that she knowingly, intelligently, and voluntarily waived those rights. Although the Miranda form did not include an express waiver of her rights, Patterson was asked to sign the form if she was willing to talk with Watson. She did so and proceeded to answer Watson's questions. Again, Patterson made no indication that she did not understand her rights, that she was incapable of waiving her rights, or that she wanted to invoke them.
 {¶ 25} Moreover, there is no evidence that Patterson's statements in Watson's vehicle and at the urgent care were anything other than voluntary remarks. Patterson was not in custody at either time, and there is no evidence that Watson had encouraged Patterson to speak in his car or that he had solicited the comment about her drug use at the urgent care.
 {¶ 26} Next, Patterson asserts that she did not voluntarily consent to give a blood sample. The taking of bodily fluids, such as blood, is an invasion of an individual's privacy. State v.Sisler (1995), 114 Ohio App.3d 337, 343, 683 N.E.2d 106. The withdrawal of a sample of blood in order to determine its alcohol or drug content for the purpose of proving a criminal charge is a search and seizure within the meaning of the Fourth Amendment, which requires either a warrant or an exception to the warrant requirement. Id. at 341, citing Schmerber v. California (1966),384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. "The United States Supreme Court has frequently recognized that a warrantless search is constitutionally permissible where a valid consent to the search has been obtained. The consent operates as a waiver of the constitutional right against unreasonable searches and seizures, provided that it is voluntary." Id. at 342 (citation omitted). The voluntariness of the consent is determined from the totality of the circumstances. State v. Sears, Montgomery App. No. 20849, 2005-Ohio-3880, ¶ 37. Regardless of whether consent has been given, due process also requires that the method actually employed to perform the search does not offend "a fundamental sense of justice." Id. at 343.
 {¶ 27} In the present case, there is no evidence that Patterson's consent was due to coercion or duress or was given in submission to a claim of lawful authority. Although Patterson was exhausted and emotionally upset at the time that Watson first encountered her, she expressed that she understood Watson's request for a blood test and was able to indicate that she needed transportation for such a test. The evidence indicates that Patterson left her residence with Watson voluntarily. Patterson later signed the Riverside Police Department Voluntary Consent for Bodily Fluids form after Watson had reviewed it with her and after she had been asked to review it independently. At that time, Patterson was no longer crying and was calm. We find nothing coercive in the manner that Patterson was driven to the urgent care. The subsequent blood draw was performed by a certified technician, and there is no evidence of anything improper about the withdrawal procedures. Accordingly, based on the evidence presented at the suppression hearing, the trial court did not err when it concluded that Patterson had voluntarily consented to the blood draw and denied her motion to suppress.
 {¶ 28} The first assignment of error is overruled.
 {¶ 29} II. "APPELLANT WAS DENIED HER CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO FILE A MOTION TO SUPPRESS PHYSICAL EVIDENCE."
 {¶ 30} III. "APPELLANT WAS DENIED HER CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO LODGE APPROPRIATE OBJECTIONS AT TRIAL."
 {¶ 31} In her second and third assignments of error, Patterson claims that her trial counsel rendered ineffective assistance by failing to file a motion to suppress the physical evidence and by failing to make appropriate objections at trial.
 {¶ 32} In order to demonstrate ineffective assistance of counsel, Patterson must establish that her counsel's representation fell below an objective standard of reasonableness and that she has been prejudiced by her counsel's deficient performance. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. "Reversal of a conviction for ineffective assistance of counsel `requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment.'"State v. Hand, 107 Ohio St.3d 378, 2006-Ohio-18, ___ N.E.2d ___ ¶ 199. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S at 694;Bradley, 42 Ohio St.3d at 142.
 {¶ 33} Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See Strickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.; State v.Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 34} First, Patterson claims that her trial attorney should have sought to suppress the drug paraphernalia found in the residence and the photograph of the contents of Patterson's purse. She argues that her home was unlawfully searched and that the drug paraphernalia and her purse were unlawfully seized without a warrant.
 {¶ 35} Assuming, arguendo, that the contents of Patterson's purse should not have been searched and photographed, Patterson has not demonstrated that the evidence was prejudicial to her. At trial, Patterson herself testified that she had used heroin three or four times and took Klonopins on July 13, 2004; on this day, she had taken drugs with Sarah, Duncan, and her mother. Patterson also testified that she had used heroin and crack cocaine on July 14th. Sarah also testified she, Patterson, and their parents had used heroin on July 11, 2004; that she, Patterson, and Duncan had used heroin on July 12, 2004. In addition, Maureen Marinetti, chief forensic toxicologist for the MVRCL, testified that Patterson's blood serum contained morphine, a metabolite of heroin, as well as trace amounts of cocaine. The jury also heard Patterson tell Watson on the audiotape of the July 15, 2004 interviews that she had used heroin, Klonopins, and crack cocaine during the days preceding Dylan's death. Watson and Skinner both testified that they had seen needle marks on Patterson's arms when her blood was drawn and that she had admitted to them at the urgent care center that she had used drugs in the past couple of days. Based on the overwhelming evidence of Patterson's drug use, Patterson has not demonstrated that she was prejudiced by the admission of photographs of the contents of her purse.
 {¶ 36} Second, Patterson asserts that her trial counsel should have objected to Sturgeon's testimony that a drug-detection canine had alerted on areas of the house although no narcotics were found. She argues that Sturgeon was not qualified to testify that the dog had alerted, as he was not the canine's handler, and that because the handler did not testify, he had no opportunity to question the dog's credentials or record for accuracy.
 {¶ 37} As stated supra, there was substantial evidence that drugs had been used in the Encore Drive residence. Sarah Patterson testified that she, Patterson, Duncan, and her parents had used heroin at the home in the days preceding Dylan's death. Marinetti's testimony confirmed that Patterson had recently used heroin and cocaine. Patterson admitted to Detective Watson on July 15, 2004, and at trial that she had used drugs at Encore Drive in the days prior to July 15, 2004. In light of the overwhelming evidence of recent drug use at Patterson's home, Patterson has failed to demonstrate that she was prejudiced by Sturgeon's testimony that a canine had alerted to drugs in the trailer.
 {¶ 38} Third, Patterson claims that her attorney should have objected to Watson's testimony that Tim Duncan was Patterson's boyfriend and that he had brought money and was "a supplier to buy heroin." She asserts that this statement was speculative and without foundation.
 {¶ 39} Although the basis for Watson's statement was not apparent when it was made, Watson indicated during his summary of his second interview with Patterson that Patterson had stated that Duncan was somebody that she had liked, and that after he had shown up at her home, she went with him to buy heroin and they used the heroin after they returned. The jury heard Patterson's statement to that effect when the state played the audiotape of the interview. Patterson further testified at trial that she and Duncan had had a prior romantic relationship and that he had purchased heroin for everyone at the residence while he was staying with her during the week that Dylan had died. Accordingly, we find no prejudice to Patterson from her counsel's failure to object to Watson's statement regarding Duncan.
 {¶ 40} Fourth, Patterson claims that her trial attorney should have objected to the testimony of Michael Fox, an investigator with the Montgomery County Coroner's Office, that Patterson had used marijuana on ten occasions while she was pregnant with Dylan. She asserts that this testimony's prejudicial effect outweighed its probative value, because her pregnancy fell outside the time frame of the indictment and the jury could have used the evidence in a cumulative manner to convict Patterson of child endangerment. Upon review of the trial as a whole and in light of the substantial evidence of Patterson's drug use during the week of Dylan's death, we find no reasonable probability that the outcome of the trial was affected by Fox's single statement regarding Patterson's use of marijuana during her pregnancy.
 {¶ 41} Fifth, Patterson asserts that her trial counsel should have objected to the admission of the state's photographs of her arms, which purportedly revealed the presence of needle marks. Upon review of the record, the photographs of Patterson's arms were merely cumulative of the testimony that Patterson had had needle marks on her arms. Both Skinner and Watson testified that they observed needle marks on Patterson's arms at the urgent care. Moreover, Sarah and Patterson both testified that Sarah had injected heroin into Patterson's arms, and Patterson testified that she had taken heroin by injection on July 12-14, 2004. Accordingly, Patterson has not demonstrated that there was a reasonable probability that the result of her trial would have been different had the photographs been excluded.
 {¶ 42} Finally, Patterson claims that her trial counsel rendered ineffective assistance by failing to call additional witnesses during the hearing on the motion to suppress. She states that a number of the state's witnesses at trial were able to testify concerning her "excessively impaired condition shortly before her waivers, blood draws, and statements were taken." Patterson contends that the court would have found that her statements and waivers were involuntary if it had heard additional testimony regarding her abnormal behavior and impaired condition.
 {¶ 43} Even assuming that Patterson's counsel had called additional witnesses, such as Wood, the Fire Battalion Chief, Black, a Children's Medical Center trauma team member, Fox, or Skinner, we cannot conclude that the trial court would have found that Patterson's consent to the blood draw and her statements were involuntary. As stated supra, there was no evidence of any coercive activity on the part of the police, and Watson had testified (and it is apparent from the tape of the interview) that Patterson was coherent, aware of her surroundings, and able to answer questions at the time of the interviews, particularly during the lengthier second interview. See State v. Dotson
(Nov. 21, 1997), Clark App. No. 97-CA-71. Watson had further acknowledged during the suppression hearing that Patterson appeared very tired. Although the additional witnesses may have further substantiated Watson's and Patterson's testimony that Patterson was very tired on July 15, 2005, it is unlikely that this additional testimony would have altered the outcome of the suppression hearing.
 {¶ 44} Patterson's second and third assignments of error are overruled.
 {¶ 45} IV. "THE TRIAL COURT ERRED IN IMPOSING MORE THAN THE MINIMUM PRISON TERM PRESUMED APPLICABLE BY STATUTE THROUGH A FINDING NOT SUBMITTED TO A JURY OR PROVED TO A JURY BEYOND A REASONABLE DOUBT."
 {¶ 46} In her fourth assignment of error, Patterson claims that the trial court erred in imposing a non-minimum prison term, citing Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2531, 159 L.E.2d 403. She asserts that, because she had not previously served a prison term, the trial court could not sentence her to a term greater than the statutory minimum without a jury finding that "the shortest term would demean the seriousness of the offender's conduct." Patterson further argues that the court erred in failing to find that the prison sentence was consistent with the purposes and principles of R.C. 2929.11
and in failing to indicate that it had considered and weighed the seriousness and recidivism factors found in R.C. 2929.12.
 {¶ 47} The Supreme Court of Ohio recently held that parts of Ohio's felony sentencing scheme are unconstitutional. State v.Foster, ___ Ohio St.3d ___, 2006-Ohio-856. The unconstitutional provisions include R.C. 2929.14(B), which states that a court must impose the minimum sentence for an offense unless (1) the offender was serving or had previously served a prison term, or (2) the court finds that the shortest term will demean the seriousness of the offense or will not adequately protect the public from future crime by the offender or others. Id. at ¶ 61. Following the United States Supreme Court's decisions inApprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348,147 L.Ed.2d 435, and Blakely v. Washington (2004),542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, the supreme court held inFoster that R.C. 2929.14(B) is unconstitutional because it "require[s] judicial factfinding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant." Foster at ¶ 83. The supreme court severed the provisions that it found to be unconstitutional, including R.C. 2929.14(B). Id. at ¶ 97, ¶ 99. In light of this holding, trial courts now have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or to give their reasons for imposing non-minimum sentences on an offender who has never served a prison term. Id.;State v. Mathis, ___ Ohio St.3d ___, 2006-Ohio-855, ¶ 26.
 {¶ 48} Because Foster held the statute under which Patterson's sentence was imposed to be unconstitutional and severed it from the sentencing provisions of the Revised Code, we must remand this case for a new sentencing hearing. Foster at ¶ 1041-05. At the sentencing hearing, the trial court "shall consider those portions of the sentencing code that are unaffected by [Foster] and impose any sentence within the appropriate felony range." We note that R.C. 2929.11 and R.C.2929.12, which set forth statutory "considerations" and do not require factfinding, were not affected by Foster. Mathis at ¶ 38. While Patterson may argue for a reduction in her sentence, nothing prevents the trial court from imposing the same sentence on remand.
 {¶ 49} The fourth assignment of error is sustained.
 {¶ 50} The sentence is reversed, and the matter is remanded for resentencing. The trial court's judgment is affirmed in all other respects.
Grady, P.J. and Brogan, J., concur.
[1] In her brief, Patterson cites to evidence presented at trial to support her assertion that she lacked the capacity to consent to the blood draw or to waive her Miranda rights. In reviewing the trial court's ruling on the motion to suppress, we are limited to the evidence presented to the trial court at the suppression hearing. State v. Clarke (Oct. 22, 2001), Butler App. No. CA2000-11-234, fn.1.