[Cite as *State v. Lewis*, 2021-Ohio-1837.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

|   |   |   |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28881 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-2644/2 |
| | : | |
| AMY LEWIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of May, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

KYLE J. LENNEN, Atty. Reg. No. 0085726, 120 West Second Street, Suite 820, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Amy Lewis, appeals from her conviction on nine counts of sexual conduct with a minor.[1]  According to Amy, the trial court erred in failing to grant her motion to suppress evidence, because her confession was not voluntarily given.  We disagree, and we will affirm the judgment of the trial court.

I.  Facts and Course of Proceedings

{¶ 2} On August 16, 2019, an indictment was filed in the trial court charging Amy and her husband, Michael, with a total of 24 crimes that occurred in connection with A.R., a minor child who was related to Michael.  The first 15 counts involved Michael, who was alleged to have committed unlawful sexual conduct with a minor (seven counts), gross sexual imposition (six counts), soliciting (one count), and public indecency (one count).  Indictment, p. 1-6.  Amy was alleged to have committed unlawful sexual conduct with a minor (nine counts).  *Id.* at p. 6-10.  The acts in question were alleged to have occurred between May 2, 2014, and May 1, 2017, when A.R. was over the age of 13, but was less than 16 years of age.  All the charges against Amy were third-degree felonies.

{¶ 3} Previously, in March 2018, Dayton Police Detective Elizabeth Alley learned of allegations that A.R. had made against Amy and Michael, with whom he had lived for some period of time.  Transcript of Proceedings (Motion to Suppress and Plea Hearing) ("Tr. 1"), p. 6.  Alley was a detective in the Special Victim's Unit and investigated crimes against children, specifically physical abuse and sex abuse.  *Id.* at p. 5.  When A.R. made the abuse allegations, he was confined in the Juvenile Detention Center because

---

[1]  To avoid confusion, we will refer to Amy Lewis and her husband, Michael Lewis, by their first names, as they were both convicted on charges relating to the sexual abuse of the same minor.

he had allegedly stabbed Michael. *Id.* at p. 29.

{¶ 4} On August 7, 2019, both Amy and Michael came to the Dayton Safety Building for an interview. *Id.* at p. 7. During the interview, Amy waived her *Miranda* rights and confessed to having had sexual relations with A.R. *Id.* at p. 10-11 and 22. The police arrested Amy at the end of the interview and, as indicated, an indictment was filed shortly thereafter, charging both Amy and Michael with having committed various sexual crimes.

{¶ 5} After the indictment was filed, counsel was appointed for Amy, and she pled not guilty to the charges. On August 26, 2019, the court filed an order granting Amy bail on her own recognizance, on condition that she have no contact with A.R. and that she be placed on electronic home detention. *See* Entry and Order Setting Bail, p. 1. Despite several requests for bail modification, the court continued Amy on electronic home detention until August 18, 2020, when she was sentenced to a prison term.

{¶ 6} During the case, Amy filed two requests for a competency and sanity evaluation, and the court granted the requests. *See* Requests (Sep. 9 and Oct. 29, 2019); Order for Examination (Sep. 10, 2019); and Order for Second Opinion Examination (Nov. 21, 2019).

{¶ 7} In the meantime, Amy filed a motion to suppress on October 17, 2019, contending that she did not voluntarily waive her *Miranda* rights and that her confession was also involuntary. The court set a hearing date for January 15, 2020. Subsequently, the parties stipulated to the content of the Forensic Psychiatry Center of Western Ohio psychiatric report, and the court filed an order finding Amy competent to stand trial. Order (Jan. 7, 2020).

{¶ 8} During the suppression hearing on January 15, 2020, Dayton Police Det. Elizabeth Alley was the only witness. Det. Alley explained the procedures she followed in obtaining the waiver of rights. Tr.1 at p. 8-12. She also discussed observations that led her to conclude that Amy was competent to undergo the interview and waiver, was not under the influence of drugs or alcohol, and understood what was being said. *Id.* at p. 13-15, 17, 20-21, 27, and 30-31. The trial court admitted the following exhibits at the hearing: State's Ex. 1 (the pre-interview form) and State's Ex. 2 (a DVD recording of the entire interview, which lasted about three hours and fifteen minutes. *Id.* at p. 31.

{¶ 9} Both sides submitted post-hearing memoranda concerning the motion to suppress. On February 11, 2020, the court overruled the motion to suppress. Amy then pled no contest to the nine charges in the indictment against her on June 23, 2020. The State noted at the hearing that there was no sentencing agreement and that it was an "open plea." Tr. 1 at p. 35. After the court found Amy guilty at the plea hearing, a combination written plea and waiver form and entry and order accepting the plea and finding Amy guilty was filed on June 25, 2020. *Id.* at p. 42; Entry of Waiver and Plea.

{¶ 10} Previously, the court had granted funds for the defense to employ a forensic psychologist. Entry (May 28, 2020) (granting a total of $1,800). After Amy pled no contest, her counsel asked for additional funds so that a forensic psychologist could conduct an interview with Amy and submit a presentence investigation report. The Court granted $500 more, for a total of $2,300. Entry (June 26, 2020).

{¶ 11} The parties then filed sentencing memoranda, with the defense asking for community control or a minimum sentence and the State asking the court to impose a sentence of not less than 30 years. At the August 18, 2020 sentencing hearing, the court

imposed four-year prison terms on each count in Counts 16 through 20, to be served concurrently with each other. The court also imposed a four-year prison term on each count in Counts 21-24. Those terms were to be served concurrently with each other and consecutively with the sentence on Counts 16 through 20, for a total prison term of eight years. In addition, the court imposed five years of post-release control and designated Amy as a Tier II sexual offender, with the attendant registration requirements. Transcript of Proceedings (Motion Hearing and Sentence Hearing) ("Tr. 2"), p. 7-9.

{¶ 12} On August 20, 2020, the court filed a judgment entry containing the above terms. Amy then filed a notice of appeal on August 25, 2020.

## I. Suppression Decision

{¶ 13} Amy's sole assignment of error states:

The Trial Court Erred in Denying Defendant's Motion to Suppress

Due to the Fact That Defendant's Confession Was Not Voluntarily Given.

{¶ 14} Under this assignment of error, Amy contends that she suffers from mental and physical diseases that rendered her waiver of counsel and confession involuntary. Specifically, Amy argues that she told Det. Alley that she left school due to an inability to comprehend, that she had bipolar disease and a chemical imbalance, that she had arthritis in her spine and was diabetic, and that due to thyroid cancer, she was typically tired and slept most of the day. Amy further stresses that she had no prior criminal experience, that the interrogation lasted an unduly long time, and that Det. Alley threatened her by stating that she would have to tell others that Amy was out to hurt kids if she did not confess.

{¶ 15} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id*.

{¶ 16} The legal standards applied to *Miranda* warnings are well known. "A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6, quoting *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "In the context of *Miranda*, the United States Supreme Court has explained the two aspects of waiver. 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the

*Miranda* rights have been waived.' " *Id.* at ¶ 7, quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). (Other citation omitted.) Furthermore, the State bears the burden of proving a defendant's knowing, voluntary, and intelligent waiver of rights. *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 100.

{¶ 17} A "written waiver of rights * * * is strong proof" that the waiver was valid. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988), citing *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

{¶ 18} "While voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, i.e., whether the action was voluntary under the totality of the circumstances." *Clark* at 261. *Accord State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, ¶ 24; *State v. Smith,* 2d Dist. Montgomery No. 24264, 2011-Ohio-3288, ¶ 20. These circumstances include " 'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 194, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *death penalty vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 19} "However, the use of an inherently coercive tactic by police is a prerequisite to a finding of involuntariness." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 71, citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). As a result, courts do not need to "assess the totality of the circumstances" unless they "first find that the detectives used a coercive tactic." *Id.*,

citing *State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001). "Evidence of use by the interrogators of an inherently coercive tactic (*e.g.*, physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis." *Clark* at 261.

{¶ 20} In the case before us, the trial court found no evidence of coercion. Order Overruling Motion to Suppress, p. 2. The court's decision was based on the hearing testimony, which the court found "largely credible," and the court's review of the exhibits and post-hearing memoranda. *Id.* at p. 1. We also have reviewed these items, including the more than three hours of Amy's interview, and we find no evidence of coercion. First, Amy voluntarily appeared at the Safety Building. Tr. 1 at p.7. Before the interview began, Det. Alley informed Amy that she was being questioned about sexual assault. *Id.* at p. 10; Ex. 2 at 14:23:57-14:24:09. Alley then explained Amy's rights using the department's pre-interview form and read each right individually to Amy. *Id.* at p. 10; Ex. 2 at 14:24:10-14:25:55. Alley also had Amy read each right out loud. After doing so, Amy indicated that she understood each right and initialed the form. Tr. 1 at p. 10-11; Ex.2 at 14:27:46-14:28:14. There was no evidence of any type of coercion during this part of the encounter.

{¶ 21} Concerning the discussion that occurred in connection with the signing of the pre-interview form, Amy argues that Det. Alley was aware that Amy expected her Eastway counselor to be there, but improperly failed to either contact the counselor to clarify the counselor's role or let Amy reach out to the counselor.

{¶ 22} There is no question that Det. Alley was aware that Amy's counselor planned to attend the interview but did not arrive that day. Tr. 1 at p. 13. However, Alley

also testified that Amy did not express unwillingness to proceed without someone present, nor did Amy indicate that she needed someone there to help her understand. *Id.* These facts do not indicate evidence of coercion.

{¶ 23} The Supreme Court of Ohio has said that, "[w]hile a defendant's mental condition is a significant factor in the voluntariness calculus, it 'does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 190, quoting *Connelly*, 479 U.S. at 164, 107 S.Ct. 515, 93 L.Ed.2d 473. *See also State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081.

{¶ 24} In *Hughbanks*, the court rejected the defendant's claim that "prior to questioning, the police failed to consult a psychiatrist to find out whether his decision to waive his rights and answer police questions was 'truly voluntary.' " *Id.* at ¶ 60. The court stressed that "[t]he police officers were not required to consult a psychiatrist or have Hughbanks evaluated by a psychiatrist to ensure that his waiver of rights and his statements were the product of his free will. *Connelly* rejected the premise that voluntariness of a confession depended on notions of 'free will.' " *Id.* at ¶ 62, quoting *Connelly* at 170. "Rather, 'voluntariness * * * has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word.' " *Id.*

{¶ 25} Again, there was no evidence of police overreaching. Det. Alley was not required to ensure that Amy had a counselor or therapist present during the interview.

{¶ 26} As evidence of mistreatment during the interview, Amy points to the fact that Det. Alley did not ask if she needed to take a break. Appellant's Brief, p. 9. Again, this

fact is not in dispute. Tr. 1 at p. 18. However, Amy did not ask for a break. *Id.* Furthermore, during the interview, the police did obtain water and tissues for Amy. State's Ex. 2 at 16:00-16:07. *Compare State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 78 (no evidence of police overreaching existed where, among other things, defendant never asked for food until after the end of his interview and was given water when he asked for it).

{¶ 27} Amy also argues that the interview was very lengthy and that the police were aware that she tired easily and slept most of the day due to her prior treatment for thyroid cancer. Having reviewed the DVD of the interview, we find no evidence of coercive measures. The interview began at about 2:23 p.m., and Amy's first incriminating statements occurred about two hours later. *See* State's Ex. 2.

{¶ 28} The first hour of the interview involved discussion of Amy's background (which included a history of sexual abuse as a child by her mother's companions) and conversation about Amy and her husband's relationship with A.R. during times he lived with them. During nearly the last half hour, the police also left the room and did not question Amy further. Tr. 2 at 17:12:55-17:42:12. *Compare State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 87 (length of interrogation was not unacceptable where defendant was not questioned for more than four hours without a break*); State v. Brewer*, 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (1990) (while defendant "was at the police station for at least seven and one-half hours before confessing, the actual interview took up only about three hours").

{¶ 29} Moreover, while Amy mentioned that her bout with thyroid cancer (which began in late 2016) made her tired, she did not appear overly tired during the interview.

Tr. 1 at p.21 and 27; Ex. 2 at 15:04:10-15:05:40. Amy did briefly state at one point during the interview that she was currently tired due to her thyroid issues. Ex. 2 at 15:05:38-1505:39. However, Amy did not ask to take a break or to stop, nor did she ask to reschedule the interview. *Compare State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 106 (among other things, defendant did not complain of being sleepy or tired during interrogation); *State v. Green*, 90 Ohio St.3d 352, 366, 738 N.E.2d 1208 (2000) (no violation where defendant was arrested at 1:45 a.m., was questioned at 5:04 a.m., was driven around in car to verify his story, signed another *Miranda* waiver at 10:30 a.m., signed an additional waiver at 2:30 p.m., and made a taped statement at 4:30 p.m.); *State v. Patterson*, 2d Dist. Montgomery No. 20977, 2006-Ohio-1422, ¶ 23 (while detective was aware that defendant "had had minimal sleep over the preceding few days and was clearly upset about the death of her child," there was no evidence that detective had "engaged in any 'overreaching' " that would render defendant's statements involuntary).

{¶ 30} Again, we have viewed the DVD of the entire interrogation and saw no evidence that Amy was tired. In fact, when Amy discussed events unrelated to alleged sexual abuse committed by herself or her husband, she was animated at times and quite talkative.

{¶ 31} Finally, Amy contends that after she denied wrongdoing for about two hours, Det. Alley threatened her by stating that "unless she gave an admission, the detective would have to tell others that Amy was out to hurt kids." Appellant's Brief at p. 10. However, this was not a "threat." Det. Alley was simply presenting Amy with the facts – i.e., if she chose not to explain her side of the story, others would conclude Amy was a

person who wanted to hurt (or abuse) a child.

{¶ 32} Specifically, after Det. Alley discussed the fact that Amy herself had been sexually abused as a child, the following exchange occurred:

Det. Alley:   Help us understand how this kind of got started.

Amy:   [No response.]

Det. Alley:   You don't want to paint [A.R.] out to be a liar, do you? [A.R.], the boy you care about.   Who cares about you.

Amy:   [No response.]

Det. Alley:   And I don't want to have to take this to the prosecutor and have the prosecutor have to – I have to tell the prosecutor that she's out trying to hurt kids, I guess that's what this is all about.   This isn't something that she – kinda got out of hand or was consensual.   This is something that she's out trying to hurt kids – her and Mike both.

Amy:   [No response.]

Det. Alley:   You know, I don't believe that's what it is.   But I don't have anything to base that off of 'cause you're not telling me anything.

Ex. 2 at 16:21:46 -16:22:45.

{¶ 33} Right after this exchange, the following discussion occurred:

Det. Alley: Can you tell me about the remote control butt plug?

Amy:   [No response.]

Det. Alley:   Whose was that?   Is it still at your house?

Amy:   Huh?

Det. Alley: Is that – the remote control butt plug, is that still at your

house?

Amy: I don't think so.

Det. Alley: You don't think so. What happened to it?

Amy: I don't know:

Det. Alley: You don't know what happened to it. Who bought it?

Amy: I think I'm just going to go ahead and tell you.

Det. Alley: Okay.

Amy: But what are my consequences?

Det. Alley: That's a good question. I don't know what the consequences are going to be, Amy. But what I can tell you is that I am not going to lie to you. And I can't make any promises to you about anything, okay? But what I can tell you is that I have to take this to a prosecutor. The prosecutor will make a decision about where to go from here, okay?

Amy: Okay.

Det. Alley: And then the judge is the one who ultimately makes a determination as to what your consequences will be. I don't have any say in that whatsoever, okay? But what I can do is I can go to the prosecutor and say, this is what she told me. She told me this is the truth. And they can take it from there. But I can't make any promises to you. Does that make sense?

Amy: Yeah.

Det. Alley: Okay.

Amy:  [A.R.] started it.

Det. Alley:  [A.R.] started it.  How did he start it?

Amy:  [no response.]

Det. Alley:  What did he start?

Amy:  How it actually got started, um, he would like, take my hand.

Because one of the things we had talked about is how, um, like how to make

um, how to make people, um horny.

Ex. 2 at 16:23:05-16:26:41.  After this, Amy implicated herself in various instances of sexual misconduct with A.R.  She also discussed certain misconduct of her husband.

{¶ 34} As noted, Det. Alley did not mislead Amy or lie to her.  To the contrary, Alley simply indicated that in the absence of contrary evidence, the conclusion the prosecutor would draw was that Amy intended to abuse A.R.  This was a correct statement.  Furthermore, Det. Alley was honest in telling Amy that she did not know what the prosecutor would do and had no control over a judge's decision.  Thus, the detective's comments were not a threat and did not demonstrate police coercion.

{¶ 35} Based on the preceding discussion, we find no evidence that the police used coercive tactics.  Given this conclusion, we need not address the totality of the circumstances.  *Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, at ¶ 71.  However, even if we were required to consider the totality of the circumstances, they indicate that Amy's waiver of rights and her confession were voluntarily, intelligently, and knowingly made.

{¶ 36} We have already considered most of the points Amy makes in her brief, other than her contention that the police pressed on with the interview despite being

aware of her diseases, mental disabilities, and medication. In this regard, Amy focuses on Det. Alley's statement that "You said you had some comprehension problems. Do you have any problem comprehending what we're talking about here?" Ex. 2 at 14:28:45-14:28:49 Amy answered, "No, but there is a possibility I will forget * * * My short term memory is messed up." *Id.* at 14:28:50-14:28:56. *See* Appellant's Brief at p. 11.

{¶ 37} While Amy did make this statement, she also said she had graduated from high school and had attended two years of college. Tr. 1 at p. 11. Review of Ex. 2 further reveals that Amy was able to read and write. In addition, Det. Alley testified that Amy "appeared to understand what was being said," "was responding with answers that made sense to the questions" Alley was asking, and "did not appear to be under the influence of anything." Tr. 1 at p. 12. Our own review of the interview indicates that Amy was able to converse freely and was able to recollect events that had occurred.

{¶ 38} Amy also focuses on Det. Alley's statement that Amy needed treatment. Appellant's Brief at p. 4 and 8. However, the statements about Amy needing treatment were made in the context of the sexual abuse Amy had encountered as a child, not in terms of her inability to understand what was going on. *See* Ex. 2 at 16:21:07-16:21:11.

{¶ 39} As noted, we defer to the fact-finder's credibility decisions if they are supported by competent, credible evidence. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8. Given the above discussion, the trial court's credibility determination and its suppression decision were supported by the required degree of evidence. Accordingly, the trial court did not err in overruling Amy's motion to suppress, and Amy's sole assignment of error, therefore, is overruled.

## III.  Conclusion

{¶ 40} Amy's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Kyle J. Lennen
Hon. Gregory F. Singer