OPINION
{¶ 1} Appellant, Lemuel C. Henry, Jr., appeals from the April 11, 2007 judgment entry of the Lake County Court of Common Pleas, which sentenced him for one count of complicity to trafficking in cocaine. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural Facts
 {¶ 3} On the night of December 19, 2005, at approximately 1:37 a.m., Officer Bilicic of the Kirtland Hills Police Department observed a vehicle traveling at a high rate *Page 2 
of speed. He clocked the vehicle at 75 miles per hour and pulled the vehicle over. He approached the vehicle, and the driver identified himself as Aubrey Sherrod ("Mr. Sherrod"). Officer Bilicic noticed multiple cherry air fresheners hanging from the ceiling, the doors, the rear passenger head rest, as well as several scattered on the floor of the vehicle. Officer Bilicic inquired of Mr. Sherrod as to his destination. Mr. Sherrod responded that he was returning from Toledo from a visit with family. He first told Officer Bilicic that the two passengers in the car were his family members, but he then indicated that he did not know the backseat passenger, which was appellant ("Mr. Henry"). Officer Bilicic noticed that Mr. Sherrod seemed to have trouble speaking, that his hands were shaking, and that overall he appeared to be very nervous. Mr. Henry and the front-seat passenger, Shontel Jackson ("Mr. Jackson") did not look at Officer Bilicic while he was speaking to Mr. Sherrod.
 {¶ 4} At that point, Officer Bilicic obtained the names of Mr. Henry and Mr. Jackson and returned to his cruiser. He submitted the occupants' names to dispatch for a computer check, called for back-up, and requested a K-9 unit. While he was communicating with dispatch he observed Mr. Sherrod throw his hands up in the air and shake his head. Officer Bilicic at that point received information from dispatch relative to all the occupants in the vehicle. Mr. Sherrod was the only person to have a valid license. Mr. Henry's and Mr. Jackson's licenses were under suspension. Officer Bilicic testified that he was beginning to write the speeding citation when Officer Povejsil, also of the Kirtland Hills Police Department, arrived on the scene, which was approximately nine to ten minutes after the stop. *Page 3 
 {¶ 5} Officer Bilicic relayed his observations to Officer Povejsil and then the two officers asked Mr. Sherrod to step out of the vehicle. Trooper Harris arrived at the scene and all three officers examined the vehicle. Mr. Sherrod was then patted down and placed in Officer Bilicic's vehicle. The officers proceeded to pat-down and pose further questions to Mr. Henry and Mr. Jackson, each in turn, after which they were both placed in Officer Povejsil's cruiser. Officer Bilicic testified that it took approximately four to five minutes to remove the three from the vehicle.
 {¶ 6} Mr. Jackson was asked if he had anything illegal; admitted that the vehicle was his, and refused to give consent to search the vehicle. With all three individuals in the officers' vehicles, the three officers began to peer into the subject vehicle, and open and close its doors. They then walked toward Officer Bilicic's cruiser where they proceeded to talk for approximately three minutes as they awaited the arrival of the K-9 unit. About fifteen minutes after the initial stop, Officer Gerardi of the Willoughby Hills Police Department arrived on the scene with his K-9, Arrow.
 {¶ 7} Officer Gerardi proceeded to conduct an outside "sniff" and walked Arrow around the car. Arrow grew very excited as he approached the rear passenger door of the driver's side of the vehicle. He scratched at the door and whined, which is indicative that he smelled an odor of a controlled substance. Due to this reaction, Officer Gerardi opened the backseat door to allow Arrow to search further. Arrow was attracted to the seams of the car, but his attention was specifically drawn to the front seat of the passenger side of the vehicle. Officer Gerardi pulled Arrow out of the car, after determining that Arrow was indicating there was contraband located in that area. The *Page 4 
officers proceeded to search the vehicle and found two hundred fifty grams of cocaine located behind the glove compartment on the front side of the vehicle's passenger side.
 {¶ 8} Mr. Henry, Mr. Sherrod, and Mr. Jackson were then transported to the Kirtland Hills Police Department, and the vehicle was inventoried and impounded. At the station, Mr. Henry spoke with Officer Bilicic who read him his Miranda rights prior to the interview. Mr. Henry related to Officer Bilicic that Mr. Sherrod had called him asking for help so that he could go to Toledo to pick up some drugs. Mr. Henry suggested they use his cousin's, Mr. Jackson's, vehicle and that since Mr. Sherrod had the valid license, he would be the one to drive. After relating this to Officer Bilicic, Mr. Henry made a written statement in the presence of Officer Povejsil.
 {¶ 9} After obtaining statements from all three individuals, they were transported to the Lake County Jail. Prior to transporting them to the jail, Officer Bilicic completed issuing Mr. Sherrod's speeding citation.
 {¶ 10} Subsequently, Mr. Henry was indicted by the Lake County Grand Jury on three counts; charge of complicity to trafficking in cocaine, a second degree felony in violation of R.C. 2923.03(A)(2); possession of cocaine, a second degree felony in violation of R.C. 2925.11; and permitting drug abuse, a fifth degree felony in violation of R.C.2925.13.
 {¶ 11} Mr. Henry entered a plea of not guilty on February 17, 2006, and on February 24, 2006, the court scheduled a jury trial for March 28, 2006.
 {¶ 12} Mr. Henry filed a motion to suppress on March 16, 2006, alleging that there was insufficient probable cause to stop the vehicle and to detain the occupants. *Page 5 
He further alleged that he did not knowingly, voluntarily or intelligently waive his Miranda rights and that any statements he made were not voluntary.
 {¶ 13} The court held the hearing on Mr. Henry's motion to suppress on June 12, 2006, in which the state presented the testimony of Officer Bilicic, Officer Povejsil, and Officer Gerardi. In a judgment entry filed July 18, 2006, the court denied Mr. Henry's motion to suppress, finding that under the totality of the circumstances the scope and duration of the stop was not impermissibly expanded beyond that which was necessary to accomplish its original purpose and that the officer did not need reasonable suspicion to order a canine sniff of the car and further, that the alert by the drug detection dog provided sufficient probable cause to search the vehicle. The court also determined that under the totality of the circumstances, Mr. Henry knowingly, voluntarily, and intelligently waived his Miranda rights. A jury trial was then scheduled for August 15, 2006.
 {¶ 14} Mr. Henry, however, failed to appear for trial and on August 17, 2006, the court revoked Mr. Henry's bond and issued a warrant for his arrest. The court held a forfeiture of bond hearing. Mr. Henry failed to appear at the hearing and on October 19, 2006, the court filed a judgment entry which adjudged the bond to be forfeited.
 {¶ 15} Ultimately, Mr. Henry entered a written plea of no contest to the charge of complicity to trafficking in cocaine, a felony of the third degree in violation of R.C. 2923.03 on April 5, 2006. The court accepted the plea and Mr. Henry agreed to proceed directly to sentencing. The court sentenced Mr. Henry to a two year term of imprisonment, with forty-five days of credit for time served and imposed a mandatory *Page 6 
fine of $5,000. The fine was then waived due to Mr. Henry's indigency, and his license was suspended for six months.
 {¶ 16} Mr. Henry now timely appeals and raises two assignments of error:
 {¶ 17} "[1.] The trial court erred to the prejudice of the defendant-appellant when it overruled his motion to suppress challenging the lawfulness of the police search and seizure, in violation of his constitutional rights against unreasonable search and seizure as guaranteed by the Fourth and Fourteenth amendments to the United States Constitution and Section 14, Article 1 of the Ohio Constitution.
 {¶ 18} "[2.] The trial court erred when it denied defendant-appellant's motion to suppress in violation of his right to due process guaranteed under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Section 10, Article 1 of the Ohio Constitution."
 {¶ 19} Standard of Review
 {¶ 20} "At a suppression hearing, the trial court, acting in its role as the trier of fact, is in the best position to resolve questions of fact and evaluate the credibility of witnesses." Village of KirtlandHills v. Strogin, 11th Dist. No. 2005-L-073, 2006-Ohio-1450, ¶ 11, citing State v. Mills (1992), 62 Ohio St.3d 357, 366. "When reviewing a trial court's decision on a motion to suppress, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." Id. citing Sate v. Guysinger (1993),86 Ohio App.3d 592, 594; State v. Fraizier (Oct. 6, 2000), 11th Dist. No. 99-T-0109, 2000 Ohio App. LEXIS 4660, 5. An appellate court must then independently review whether the trial court correctly applied the legal standard. Id., citing State v. Anderson (1995), 100 Ohio App.3d 688,691. *Page 7 
 {¶ 21} "The Fourth Amendment of the United States Constitution, as well as Article One, Section Fourteen, of the Ohio Constitution, guarantees `the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' When a police officer stops an automobile and detains its occupants, a `seizure' is committed within the meaning of the Fourth andFourteenth Amendments." Id. at ¶ 12, citing State v. Wojtaszek, 11th Dist. No. 2002-L-016, 2003-Ohio-2105, ¶ 15, citing Delaware v. Prouse (1979),440 U.S. 648, paragraph two of the syllabus.
 {¶ 22} "Stopping a vehicle and detaining its occupants is a seizure within the meaning of the Fourth Amendment." State v. Carter, 11th Dist. No. 2003-P-0007, 2004-Ohio-1181, ¶ 33, citing Prouse at 653, citingU.S. v. Marinez-Fuerte (1976), 428 U.S. 543, 556-558. "Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under theFourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." Id, citing Dayton v. Erickson (1996), 76 Ohio St.3d 3, 11.
 {¶ 23} However, "[a]n officer may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion that some further criminal activity is afoot." Id. at ¶ 34, citingState *Page 8 v. Retherford (1994), 93 Ohio App.3d 586, 600, citing U.S. v.Brignoni-Ponce (1975), 422 U.S. 873, 881-882. "In determining whether a detention is reasonable, the court must look at the totality of the circumstances." State v. Matteucci, 11th Dist. No. 2001-L-205, 2003-Ohio-702, ¶ 30, citing State v. Bobo (1988), 37 Ohio St.3d 177,178.
 {¶ 24} Motion to Suppress
 {¶ 25} In his first assignment of error, Mr. Henry argues that the trial court erred in denying his motion to suppress since there was no reasonable suspicion present to continue to detain him beyond the initial traffic stop. Specifically, Mr. Henry contends that after the initial traffic stop took place, the officer unlawfully detained him since the continued detainment was not based on any specific articulable facts that criminal activity was afoot. We find this argument to be without merit.
 {¶ 26} There is no question that Mr. Sherrod committed a traffic violation when he was speeding down the interstate at seventy-five miles per hour. "It is well established that an officer may stop a motorist upon his or her observation that the vehicle in question violated a traffic law." Strogin at ¶ 13, citing State v. Boczar, 11th Dist. No. 2004-A-0063, 2005-Ohio-6910, ¶ 11, citing Erickson at 11-12. Moreover, it is equally settled that "[i]f a vehicle has been lawfully detained, the exterior sniff by a trained narcotics dog to detect the presence of illegal drugs does not constitute a search because it does not violate a reasonable expectation of privacy." Matteucci at ¶ 34; State v.Rusnak (1997), 120 Ohio App.3d 24, 28; State v. French (1995),104 Ohio App.3d 740, 747; State v. Carlson (1995), 102 Ohio App.3d 585, 594. "As such, `Ohio courts have held that police need not have a reasonable suspicion of drug-related activity prior to subjecting an otherwise lawfully detained vehicle to a canine sniff.'" Id., *Page 9 
quoting Rusnak at 28. Furthermore, "once a trained drug dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband." Id at ¶ 36, citingFrench at 749. Thus, the critical question that Mr. Henry raises is whether he was unreasonably detained during the interval between the initial stop and Arrow's subsequent search of the vehicle.
 {¶ 27} Detention After Initial Traffic Stop
 {¶ 28} "`[W]hen detaining a motorist for a traffic violation, an officer may delay a motorist for a time period sufficient to issue a ticket or a warning.'" State v. Batchili, 113 Ohio St.3d 403,2007-Ohio-2204, at ¶ 12, quoting State v. Keathley (1988),55 Ohio App.3d 130, 131. "This measure includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates." Id., citing State v. Bolder), 12th Dist. No. CA2003-03-007,2004-Ohio-184, ¶ 17, citing Prouse at 659. "Further, `[i]n determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" Id., quoting State v.Carlson (1995), 102 Ohio App.3d 585, 598-599, citing State v. Cook
(1992), 65 Ohio St. 3d 516, 521-522, and U.S. v. Sharpe (1985),470 U.S. 675.
 {¶ 29} It is critical to note that Officer Bilicic had a reasonable suspicion of criminal activity prior to issuing the citation. SeeMatteucci at 31, Mentor v. Fedor (Sept. 15, 2000), 11th Dist. No. 99-L-166, 2000 Ohio App. LEXIS 4213, 6. Indeed, these suspicions arose when he first confronted Mr. Sherrod. Specifically, Officer Bilicic observed an absurd amount of cherry air fresheners located around the car. There were more than eight air fresheners in various locations of the vehicle. Furthermore, he *Page 10 
noticed that Mr. Sherrod appeared very nervous, that his hands were shaking, and that he was having trouble speaking in that he could not complete sentences. Moreover, neither Mr. Jackson nor Mr. Henry would meet the officer's gaze and had their heads lowered. He further became suspicious when Mr. Sherrod relayed conflicting stories as to the identification of the passengers. When Officer Bilicic returned to his cruiser to run a computer check, he also called for backup and a K-9 unit.
 {¶ 30} Thus, shortly after the initial stop and questioning while all the occupants were still in the vehicle, under the totality of the circumstances, Officer Bilicic had reasonable suspicion that other criminal activity was afoot. See, e.g. Matteucci (holding that a police officer had a reasonable suspicion to continue the stop and have a trained narcotics dog examine the vehicle when the defendant passenger appeared very nervous and her hands were shaking, that the defendant driver answered the passenger's questions, the passenger and driver gave conflicting stories; and further, after the patrolman was in his patrol car, he observed the passenger make a furtive movement).
 {¶ 31} Later, at the point where warrant checks were complete, all occupants were in the officers' vehicles, and the officers had visually inspected the vehicle, even opening and closing the doors, there was still no probable cause to search the vehicle because the K-9 had yet to arrive. Officer Bilicic had just begun writing Mr. Sherrod's traffic citation.
 {¶ 32} The officers were permitted to ask the three occupants to get out of the car, which was done serially. "Once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without *Page 11 
violating the Fourth Amendment's proscription of unreasonable search and seizures.'" Strogin at ¶ 19. "Further, it is `proper for an officer to order a driver to exit a lawfully stopped vehicle, even if there was no reasonable suspicion of criminal activity.'" Id., citing State v.Jennings (Mar. 3, 2000), 11th Dist. No. 98-T-0196, 2000 Ohio App. LEXIS 800, 13.
 {¶ 33} Dilatory Tactics
 {¶ 34} It is apparent that the traffic stop in this case took longer than the norm and that the police tactics evaluated in isolation give the appearance of an unconstitutional, prolonged detention. Specifically, Officer Bilicic testified that a normal stop takes approximately seven to nine minutes. In this case, the K-9 unit did not arrive until fifteen minutes after the stop. By the time Arrow arrived, Officer Bilicic had already run a background check on all the occupants, and the three were frisked and questioned. Other than stalling until Arrow arrived, the question remains as to why the stop took more than double the usual time.
 {¶ 35} As we are bound by precedent, we are unwilling to find that the prolonged detention was impermissible since in this case, additional facts were encountered during the initial stop. When those facts are viewed, not in "isolation from each other" but together, under the "totality of the circumstances", they give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop. U.S. v. Arvizu (2002), 534 U.S. 266, at syllabus.
 {¶ 36} Erosion of the Fourth Amendment
 {¶ 37} Over the years since the decision in Terry v. Ohio (1968),392 U.S. 1, there has been a steady erosion of the Fourth Amendment protection afforded those *Page 12 
occupying a motor vehicle. Now when reviewing a reasonable suspicion determination, the Supreme Court of the United States has instructed us to look at the "`totality of the circumstances' of each case to see whether the detaining officer has a `particularized and objective basis' for suspecting legal wrongdoing. (Citation omitted.) This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that `might well elude an untrained person.'"Arvizu at 273, quoting U.S. v. Cortez, (1981), 449 U.S. 411. The Supreme Court in Arvizu recognized that the "concept of reasonable suspicion is somewhat abstract" but instructed that the reviewing court must give due weight to the factual inferences drawn by the officer and the trial court and not evaluate and reject "certain factors in isolation from each other." Arvizu at 273, 274.
 {¶ 38} We are also bound by the recent decision of the Supreme Court of Ohio in State v. Batchili (2007), 113 Ohio St. 3d 403, in which the court, citing Arvizu, held that the "`reasonable and articulable' standard applied to a prolonged traffic stop encompasses the totality of the circumstances, and a court may not evaluate in isolation each articulated reason for the stop." Id. at paragraph two of the syllabus.
 {¶ 39} In Batchili, as in this case, there was no question as to the legality of the traffic stop. The case focused on the length of the stop before the K-9 officer arrived and alerted. In reversing the decision of the Sixth District, the court found that the appellate court failed to analyze whether the length of the stop before the dog's alert was reasonable. Citing lower court decisions in State v. Howard, 12th Dist. Nos. CA2006-02-002 and CA2006-02-003, 2006-Ohio-5656, State v.Keathley and State v. Bolder), as well as its own in State v.Carlson (1995), 102 Ohio App.3d 585, the court *Page 13 
laid the foundation for its holding in Batchili on certain tenets, the first being that "`[w]hen detaining a motorist for a traffic violation, an officer may delay the motorist for a time period sufficient to issue a ticket or warning.'" Batchili at ¶ 12. The second is that "[t]his measure includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates." Id. at ¶ 12. The third is "`[i]n determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" Id.
 {¶ 40} As the trooper in Batchili was still waiting on the backgrounds check at the time the K-9 officer arrived and conducted the sniff, the court held that the traffic stop was not "unconstitutionally prolonged when permissible background checks have been diligently undertaken and not yet completed at the time a drug dog alerts on the vehicle." Id. at paragraph one of the syllabus.
 {¶ 41} In Mr. Henry's case, however, the backgrounds checks had been completed, no outstanding warrants found, all three occupants of the vehicle had been frisked, separately questioned, and placed in the cruisers. The three officers had already conducted a plain view search of the vehicle, and still no K-9 officer. Officer Bilicic had just started to write the speeding ticket when Arrow arrived. After viewing the videotape of the stop and reviewing the records from the suppression hearing, it does appear that the officers prolonged the stop so that Arrow could arrive on the scene. But according to Batchili, our analysis may not end.
 {¶ 42} Although the majority in Batchili found that there had been no showing that the detention was delayed to allow the canine to arrive, the majority's opinion goes *Page 14 
beyond the facts of Batchili and once again reaffirms the determination in Howard, supra, that "`the detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop.'"Batchili at ¶ 15.
 {¶ 43} Thus, in this case when the "collection" of factors cited by the officer underlying his suspicion of drug activity and decision to call for a K-9 officer are viewed as a whole and the law ofBatchili is applied, we are compelled to give due weight to the inferences drawn by the officer and the trial court that "crime was afoot" in this case and uphold the continued detainment. Terry v.Ohio, supra.
 {¶ 44} Nevertheless, we would be remiss if we did not take this opportunity to remind law enforcement officers of the dangers of engaging in a pretextual stop in which a traffic citation is issued in a dilatory manner. The circumstances of this case present a perilously close set of facts, and we must always be mindful that "[t]he liberties of the American citizen depend upon the existence of established and known rules of law limiting the authority and discretion of men wielding the power of government." Perry Cooper, Sources of Our Liberties, (Chicago: American Bar Association, 1959), at 1.
 {¶ 45} For the following reasons, Mr. Henry's first assignment of error is without merit.
 {¶ 46} Waiver of Miranda Rights
 {¶ 47} In his second assignment of error, Mr. Henry contends that the trial court erred in denying his motion to suppress since he did not knowingly, voluntarily, and intelligently waive his Miranda Rights prior to giving his statement to the police. *Page 15 
Specifically, Mr. Henry contends that because he did not speak to the police until approximately 3:00 a.m. in the morning, he was too tired and sleepy to comprehend what he was doing. We find this argument to be without merit.
 {¶ 48} "Prior to an interrogation of a suspect in custody, the suspect must be advised of his right to remain silent and his right to an attorney." State v. Hiles, 11th Dist. No. 2002-T-0156, 2003-Ohio-6411, ¶ 34, citing Miranda v. Arizona (1966), 384 U.S. 436, 444. "A suspect may waive these rights, but the government has the burden of demonstrating that the waiver was knowingly and voluntarily made." Id., citing Miranda at 475.
 {¶ 49} "A proper waiver of Miranda rights is not a matter of form; rather the question is whether the defendant knowingly and voluntarily waived his rights." State v. Beam (1991), 77 Ohio App. 3d 200, 204, citing State v. Scott (1980), 61 Ohio St.2d 155, following NorthCarolina v. Butler (1979), 441 U.S. 369, 373. "Determining whether a valid waiver of Miranda rights occurred requires a consideration of the totality of the circumstances surrounding the interrogation as to whether statements were made knowingly and voluntarily, and whether defendant decided to forgo his rights to assistance of counsel and to remain silent." Id. citing Fare v. Michael C. (1979), 442 U.S. 707.
 {¶ 50} There is simply no evidence that Mr. Henry was confused or did not understand the rights he was waiving. Rather, the record reveals that Mr. Henry was read his Miranda rights by Officer Bilicic. Mr. Henry followed along on a Miranda waiver form as Officer Bilicic read Mr. Henry his Miranda rights out loud. During this time, Mr. Henry appeared nervous and was awake. When Officer Bilicic completed reading Mr. *Page 16 
Henry his rights he asked Mr. Henry if he understood his rights, to which Mr. Henry affirmatively responded. Officer Bilicic then explained the bottom portion of the Miranda waiver form, which states: "I have read the statement of rights and I understand what my rights are. I am willing to answer anticipate questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."
 {¶ 51} After reading both portions of the form, the Miranda rights, and then the understanding of waiver, Mr. Henry without question signed underneath both portions. At no time did Mr. Henry indicate he did not understand his rights, request to talk to an attorney, or request to stop the interview. Rather, after the completion of his waiver, he gave his statement to Officer Bilicic. Further, mere fatigue on the part of a suspect does not equate to coercive conduct by the police, absent evidence that the suspect's willpower is overborne. See, State v.Patterson, 2d Dist. No. 20977, 2006-Ohio-1422, ¶ 20-24.
 {¶ 52} Mr. Henry's second assignment of error is without merit.
 {¶ 53} The judgment of the Lake County Court of Common Pleas is affirmed.
TIMOTHY P. CANNON, J., concurs,
COLLEEN MARY OTOOLE, J., dissents with Dissenting Opinion.