OPINION
{¶ 1} Franklin F. Bumgardner ("Mr. Bumgardner"), appellant, appeals his conviction and sentence imposed after pleading no contest to three counts of gross sexual imposition, rape, and attempted rape. For the reasons that follow, we affirm.
 {¶ 2} Statement of Facts and Procedural History
 {¶ 3} On August 4, 2006, Warren Township Police responded to a report made by twelve-year-old "C.B." that her stepfather, Mr. Bumgardner, had sexually abused her. *Page 2 
After giving a videotaped confession to police, on August 11, 2006, Mr. Bumgardner was indicted for three counts of gross sexual imposition, felonies of the third degree, in violation of R.C. 2907.05(A)(4) and (B); four counts of rape, life, in violation of R.C. 2907.02(A)(1)(b) and (B); and one count of attempted rape, a felony of the second degree, in violation of R.C. 2923.02(A) and 2907.02.
 {¶ 4} On August 31, 2006, defense counsel filed a motion to have the court determine the competency of Mr. Bumgardner to stand trial. On September 7, 2006, the trial court ordered Mr. Bumgardner to be evaluated by the Forensic Psychiatry Center of Northeast Ohio to determine his competency to stand trial, including a determination of whether he is capable of understanding the nature and objective of the proceedings against him, whether he is capable of assisting in his defense, as well as determining whether he is mentally ill or mentally retarded.
 {¶ 5} A competency hearing was held on February 7, 2007. Thomas Gazley ("Dr. Gazley"), Ph.D., of the Forensic Psychiatry Center of Northeast Ohio, testified regarding his opinion as to Mr. Bumgardner's competency. After interviewing Mr. Bumgardner, reviewing the videotape of his interrogation, and medical records of the victim, and after interpreting an estimated I.Q. test, Dr. Gazley testified that in his opinion Mr. Bumgardner has the ability to understand the nature and objective of the proceedings against him, can aid and assist his attorney in his own defense, and is therefore competent to stand trial. On cross-examination, Dr. Gazley testified that Mr. Bumgardner's I.Q. is in the borderline range of 78, with an I.Q. of 70, below the range of mental retardation. However, since Mr. Bumgardner was able to give adequate *Page 3 
responses to questions asked regarding his competency, Dr. Gazley still believed Mr. Bumgardner was able to understand the proceedings and assist in his defense.
 {¶ 6} On February 8, 2007, defense counsel filed a motion to have Dr. John M. Fabian ("Dr. Fabian") conduct an independent evaluation for competency and asked for payment for such expert assistance. The court granted the motion.
 {¶ 7} On March 29, 2007, Mr. Bumgardner filed a motion to suppress all verbal, written, and recorded statements given. Mr. Bumgardner alleged that such statements were secured in violation of his Fifth, Sixth and Fourteenth Amendment rights, in derogation of his Miranda rights; that he did not waive his Miranda rights in a voluntary and knowing manner, and that the statements were secured without probable cause for an arrest and were secured as a result of undue influence imposed upon him by the police.
 {¶ 8} On April 6, 2007, Mr. Bumgardner signed a written waiver of his speedy trial rights. On April 12, 2007, the court found Mr. Bumgardner competent to stand trial.
 {¶ 9} On August 17, 2007 and September 5, 2007, the trial court held a hearing on Mr. Bumgardner's motion to suppress. The state presented Sergeant Mark Reese ("Sergeant Reese") and Lieutenant Donald Bishop ("Lieutenant Bishop") as witnesses. The defense called Mr. Bumgardner and Dr. Fabian as its witnesses.
 {¶ 10} Sergeant Reese testified that on August 4, 2006, in response to the sexual assault report made by Mr. Bumgardner's twelve-year-old step-daughter against him, he ran a records check and found that Mr. Bumgardner had an outstanding warrant for his arrest on domestic violence charges. *Page 4 
 {¶ 11} Sergeant Reese went to Mr. Bumgardner's residence at approximately 9:16 p.m., along with two other officers. He told Mr. Bumgardner there was a warrant for his arrest. Mr. Bumgardner appeared nervous and began shaking as he blurted out that he "didn't do nothing wrong, that alls it was oral sex." Sergeant Reese orally recited the Miranda rights, told Mr. Bumgardner that his step-daughter had made a sexual assault report against him, and asked him if he wanted to speak to his lieutenant. Mr. Bumgardner indicated that he did want to speak to the lieutenant, but again started saying that he did not understand why a report was made against him, that his stepdaughter wanted it, and that it was only oral sex.
 {¶ 12} Mr. Bumgardner was patted down, handcuffed, and transported to the police station. Mr. Bumgardner's handcuffs were removed, and he was taken into Lieutenant Bishop's office. According to Sergeant Reese, Lieutenant Bishop told Mr. Bumgardner that he wanted to "pre-interview" him and videotape the interview. Prior to the interview, Lieutenant Bishop had Mr. Bumgardner read back to him, line by line, from a pre-printed form containing the Miranda rights. The form contained the notation "not under arrest." Lieutenant Bishop asked Mr. Bumgardner if he understood each of his rights, and, if so, to initial each line. Mr. Bumgardner indicated that he understood each of his rights and placed an initial next to each line. According to Sergeant Reese, the Miranda rights were given beginning at 10:00 p.m. and ended at 10:18 p.m.
 {¶ 13} Mr. Bumgardner was offered coffee or something to eat prior to the interview. Another officer left the station in order to buy Mr. Bumgardner a cup of coffee. The videotaped interview then began. During the interview, which lasted approximately seventeen minutes, Sergeant Reese testified that he never stopped or *Page 5 
rewound the videotape. Sergeant Reese also admitted that after speaking with the prosecutor, he drafted a supplemental report within the month prior to the suppression hearing.
 {¶ 14} The videotaped interview, which was introduced into evidence, contained various admissions by Mr. Bumgardner, including admissions that he had sexual contact and sexual intercourse with C.B. somewhere between ten to fifteen times over the past two and one-half years, including three acts of sexual intercourse. Mr. Bumgardner said that the sexual contact included touching each other's penis and vagina, oral sex, and insertion of his fingers into C.B.'s vagina. Mr. Bumgardner said that he understood what they did was wrong, that he had spoken with C.B. about stopping the sexual contact, particularly after she began menstruating, but that she initiated more sexual contact. Mr. Bumgardner expressed his love for C.B. and said that he was "very protective of my kids." At the beginning and toward the end of the interview, Mr. Bumgardner acknowledged that he read and understood his constitutional rights. Mr. Bumgardner appeared calm throughout the interview and also agreed that he was not coerced by police into making any statements.
 {¶ 15} When the interview was complete and the tape was turned off, the sergeant said that Mr. Bumgardner remarked that he would never have done something like this to his biological daughter. Mr. Bumgardner was then transported to the Trumbull County Jail.
 {¶ 16} Lieutenant Bishop testified that fellow officers contacted him between 9:20 p.m. and 9:35 p.m. on August 4, 2006, and advised him they were bringing Mr. Bumgardner into the station. The lieutenant corroborated the procedure he used to *Page 6 
Mirandize Mr. Bumgardner. Specifically, he said that he asked Mr. Bumgardner to read each line describing the Miranda rights to him twice, and to initial each line if he understood the rights he read. Lieutenant Bishop asked Mr. Bumgardner if he understood these rights, and Mr. Bumgardner answered affirmatively and initialed each line.
 {¶ 17} Although the Miranda form stated that Mr. Bumgardner was not under arrest and was free to leave, Lieutenant Bishop said that he was not free to leave because of the warrant for the domestic violence charge. The lieutenant said that Mr. Bumgardner could have left the interview. However, Mr. Bumgardner never asked to speak to an attorney nor did he ask to leave during his interview. Lieutenant Bishop also testified that the videotape was never stopped or rewound. He further testified that he never promised Mr. Bumgardner anything in return for making a statement nor did he coerce him into making the statement.
 {¶ 18} Mr. Bumgardner took the stand at the suppression hearing and gave a completely different version of what transpired the night he was interviewed and arrested. He testified that when the police came to his house, they told him he was being arrested for failure to pay child support. Then, after he was handcuffed, he said he was told that he was being arrested for rape. He also said that when he was handed the Miranda form to read and initial, he told the officer that he could not read very well. The officer said: "Well, read the first one * * * Well, if you don't understand the rest of it, just initial it." Mr. Bumgardner said he asked the officer: "Shouldn't I have a lawyer?" In response, the officer told him: "Look at the top of the paper. It says right here you're not *Page 7 
under arrest. You don't need a lawyer." According to Mr. Bumgardner, the police told him if he gave them a statement, he would not go to prison.
 {¶ 19} Mr. Bumgardner also testified that the police stopped the videotape three different times during his interview. After stopping the tape, he said the police told him to just answer "yes" to each question asked. Again, he asked if he needed a lawyer and was told: "You're not under arrest. You don't need a lawyer. We're just talking."
 {¶ 20} Dr. John Fabian evaluated Mr. Bumgardner to determine whether he was competent to waive his Miranda rights. Dr. Fabian testified that Mr. Bumgardner has a full scale I.Q. of 80, with a verbal I.Q. in the borderline range of 79 and a performance I.Q. of 85. His reading abilities place him at the fourth or fifth grade level, but his sentence comprehension is at the eleventh grade level. Because Mr. Bumgardner told Dr. Fabian that he only read the first of his Miranda rights, Dr. Fabian testified that he could not say whether he actually understood these rights. However, he then said that Mr. Bumgardner's verbal abilities and I.Q. level would prevent him from fully appreciating what the consequences were if he gave up his Miranda rights.
 {¶ 21} On cross-examination, Dr. Fabian admitted that although Mr. Bumgardner has borderline intellectual functioning, he is not mentally retarded. He also admitted that from viewing the videotaped interview, there was no coercion or threatening behavior made by the police. He also agreed that Mr. Bumgardner appeared to give the police short and coherent answers to the questions posed.
 {¶ 22} Regarding his right to comprehend and appreciate his Miranda rights, Dr. Fabian said that Mr. Bumgardner placed in the 22nd percentile compared to other offenders. However, Dr. Fabian testified that Mr. Bumgardner did not appear to yield to *Page 8 
suggestibility when he asked him questions. However, Dr. Fabian acknowledged that he was not present to witness any alleged coercive behavior by the police during their interview of Mr. Bumgardner. Dr. Fabian refused to give an overall opinion as to Mr. Bumgardner's competency to waive his Miranda rights, stating that "it was a trier of fact issue."
 {¶ 23} Following the hearing, the trial court overruled Mr. Bumgardner's motion to suppress, finding that he knowingly, intelligently, and voluntarily waived his Miranda rights and that the statements were made without any coercion on the part of the police. On September 19, 2007, Mr. Bumgardner entered a plea of no contest to the offenses to which he was charged. The trial court accepted the plea of no contest, found Mr. Bumgardner guilty and sentenced him as follows: a prison term of two years each on counts one, two and three (gross sexual imposition); four years on count eight (attempted rape); and life imprisonment with parole eligibility after serving ten years for the rape charge. The sentences on counts four, five, six, seven, and eight were mandatory. A five-year period of post release control was also mandatory on counts one, two, three, and eight. The court also found that Mr. Bumgardner was a sexual predator, a finding to which Mr. Bumgardner stipulated.
 {¶ 24} Mr. Bumgardner filed the instant appeal, raising one assignment of error:
 {¶ 25} "The trial court erred, to the prejudice of the appellant, by admitting evidence containing admissions by appellant when the evidence was obtained without a valid waiver of rights made knowingly and intelligently."
 {¶ 26} Motion to Suppress Standard of Review *Page 9 
 {¶ 27} "At a hearing on a motion to suppress, the trial court functions as the trier of fact, and, therefore, is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of any witnesses." State v. McGary, 11th Dist. No. 2006-T-0127, 2007-Ohio-4766, ¶ 20, citing State v. Molek, 11th Dist. No. 2001-P-0147, 2002-Ohio-7159, ¶ 24, citing State v. Mills (1992),62 Ohio St.3d 357, 366; see, also, State v. Mustafa (Dec. 14, 2001), 11th Dist. No. 2000-P-0116, 2001 Ohio App. LEXIS 661, 3-4. "Thus, `[a]n appellate court must accept the findings of fact of the trial court as long as those findings are supported by competent, credible evidence.'" Id., citing State v. Retherford (1994), 93 Ohio App.3d 586, 592; City ofRavenna v. Nethken, 11th Dist. No. 2001-P-0040, 2002-Ohio-3129, ¶ 13. "After accepting such factual findings as true, the reviewing court must then independently determine, as a matter of law, whether or not the applicable legal standard has been met." Id.
 {¶ 28} Requirements For Valid Waiver of Miranda Rights
 {¶ 29} Mr. Bumgardner contends that due to his low I.Q. and limitations in intellectual functioning, he was prevented from knowingly, voluntarily, or intelligently waiving his Miranda rights. He further argues that Dr. Fabian's expert testimony supports the conclusion that he was incapable of comprehending these rights. Thus, Mr. Bumgardner maintains that the videotaped statements he made to the police should have been suppressed and the failure to do so constitutes reversible error.
 {¶ 30} The seminal decision of Miranda v. Arizona (1966),384 U.S. 436, 479, requires that a suspect in police custody "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an *Page 10 
attorney one will be appointed for him prior to any questioning if he so desires." A suspect may waive these rights, but "the government has the burden of demonstrating that the waiver was knowingly and voluntarily made." State v. Henry, 11th Dist. No. 2007-L-082, 2007-Ohio-6732, ¶ 48, citing Miranda at 475.
 {¶ 31} "A proper waiver of Miranda rights is not a matter of form; rather the question is whether the defendant knowingly and voluntarily waived his rights." Id. at ¶ 49, citing State v. Beam (1991),77 Ohio App.3d 200, 204, citing State v. Scott (1980), 61 Ohio St.2d 155, following North Carolina v. Butler (1979), 441 U.S. 369, 373. Thus, in order to effectuate a valid waiver of one's Miranda rights, two requirements must be met. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the `totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that theMiranda rights have been waived." Moran v. Burbine (1986), 475 U.S. 412,421. See, also, State v. Lather, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 6-7.
 {¶ 32} "[T]o meet the first aspect of a voluntary waiver, the waiver must be noncoercive. `A suspect's decision to waive his Fifth Amendment privilege against compulsory self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct.'" Lather at ¶ 8, citing State v. Dailey (1990),53 Ohio St.3d 88, *Page 11 
paragraph two of the syllabus. The second aspect of the waiver test is whether the waiver was made with full awareness. Id.
 {¶ 33} "Determining whether a valid waiver of Miranda rights occurred requires a consideration of the totality of the circumstances surrounding the interrogation as to whether statements were made knowingly and voluntarily, and whether defendant decided to forgo his rights to assistance of counsel and to remain silent." Henry at ¶ 49, citing Fare v. Michael C. (1979), 442 U.S. 707.
 {¶ 34} The Effect of A Low I.Q. and Limited Intellectual Functioningon Waiver of Miranda Rights
 {¶ 35} In arguing that he was incapable of waiving his Miranda rights due to his low I.Q. and limited intellectual functioning, Mr. Bumgardner relies primarily on the decision of Garner v. Mitchell (6th Cir. 2007),502 F.3d 394, rehearing, en banc, granted by, vacated by Garner v.Mitchell (6th Cir. 2008), 2008 U.S. LEXIS 360. We note, however, that the Garner decision has been vacated pending a rehearing on the matter, and is therefore of limited value to our analysis.
 {¶ 36} However, it is significant to recognize that even theGarner court emphasized that it was "rejecting] calls to establish a categorical rule that a low I.Q. or other significant limitations in intellectual functioning are dispositive and make a suspect with such characteristics categorically unable to give a valid waiver ofMiranda rights." Id. at 15. Likewise, in State v. Collins (Dec. 20, 1996), 11th Dist. No. 95-A-0044, 1996 Ohio App. LEXIS 5805, we stressed the fact that this court has repeatedly held that while subnormal mentality may be considered in determining if a confession was knowingly and intelligently made, "`diminished I.Q. will not, in and of itself, negate the waiver and preclude admission.'" Id. at 15-16, citingState v. Stewart (1991), *Page 12 75 Ohio App.3d 141, 148, quoting State v. Daniel (Dec. 31, 1990), 11th Dist. No. 89-T-4214, 1990 Ohio App. LEXIS 5877, 20-21.
 {¶ 37} Even if the Garner decision remains the law, we would still find that it is factually distinguishable from the instant case. InGarner, the petitioner was convicted and sentenced to death on five counts of aggravated murder, one count of aggravated burglary, two counts of aggravated arson, one count of theft, and one count of receiving stolen property. At the time the offenses were committed, Garner was nineteen years old. Garner had completed the seventh grade, had a full-scale I.Q. of 76, and also had demonstrated signs of a learning disability, attention deficit disorder, and organic brain impairment.
 {¶ 38} The Sixth Circuit held that Garner's waiver of his Miranda rights was not made knowingly and intelligently. The court based its decision on several factors, including the petitioner's age, experience, education, background, and intelligence. In addition, the court relied upon an unrebutted expert's opinion that Garner did not have full comprehension of the Miranda warnings. The expert's opinion was based upon his administration of the Grisso test, which is "specifically designed to `assess[ ] a defendant's comprehension of the Miranda warnings themselves' and `provid[e] a comparison of the defendant's performance to that of other defendants of various ages and levels of intelligence.'" Id. at 411, citing Thomas Grisso, Instruments For Assessing Understanding Appreciation of Miranda Rights 4 (1998). Based upon these test results, the expert opined that Garner "does not have full comprehension of Miranda warnings or his right to remain silent." Id. at 414. The expert further opined that Garner's "cognitive and linguistic limitations make the likelihood of misunderstanding *Page 13 
and suggestibility to input from others greater than with mentally typical individuals." Id. at 418. Specifically, Garner could not define the word "right" and did not understand the right to remain silent.
 {¶ 39} This is in contrast to Mr. Bumgardner's situation here. In this case, while Mr. Bumgardner had a low, borderline I.Q. of 79 and only went to school through the eighth grade, he was older (approximately thirty-two years old at the time of the offenses) than the petitioner inGarner and was able to fully explain the meaning of the Miranda rights. Dr. Fabian's report demonstrates this understanding. The report states: "I provided Mr. Bumgardner with the formal warnings that were presented to him which he initialized. I asked him about his current knowledge of each right. The warnings and his current responses are below:
 {¶ 40} "You have the right to remain silent."
 {¶ 41} [Response] "I don't have to speak."
 {¶ 42} "Anything you can say can be used against you in court."
 {¶ 43} [Response] "They could use a statement in court."
 {¶ 44} "You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning."
 {¶ 45} [Response] "They kept saying I was not under arrest and I did not need a lawyer. It means I could have a lawyer in the room."
 {¶ 46} "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish."
 {¶ 47} [Response] "I didn't read it at the time, only the first statement. It means if I asked for one I would get one." *Page 14 
 {¶ 48} "If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."
 {¶ 49} [Response] "I kept saying I shouldn't be doing this. He said I had to if I didn't want to go to prison. It means I had the right to stop at anytime."
 {¶ 50} Furthermore, in Dr. Gazley's competency evaluation, Mr. Bumgardner also demonstrated a solid grasp of the legal proceedings and was able to clearly explain the nature of the proceedings to Dr. Gazley as follows:
 {¶ 51} "Mr. Bumgardner was asked about the role and function of various court personnel. He described the role of the judge as `he listens, he hears what's going on, he sets bond, and makes decisions.' The role of a jury was described as `they find you guilty or not guilty they listen and they look at evidence.' Witnesses were described as persons who `tell their side of the story, they witnesses [sic] what happened.' Evidence was explained as `it's like a tape, it can be used against you or for you, it can be used to prove you innocent or guilty.' The defense attorney was described as his attorney who `defends me, knows the law and tries to get me found not guilty.' Theprosecutor's job was described by Mr. Bumgardner as `they're on the other side, they want to convict me.'" Dr. Gazley opined that "[b]ased on his statements, it is evident Mr. Bumgardner is aware of the adversarial nature of legal proceedings."
 {¶ 52} The trial court found that these responses, along with the videotaped interview itself, were relevant in its determination that Mr. Bumgardner had full understanding of the Miranda rights and the effect of waiving those rights. With respect to the responses Mr. Bumgardner gave to Dr. Gazley, the court concluded: "First, the *Page 15 
Defendant could not wait to give his self serving explanations to Dr. Fabian of why a particular right did not apply to his situation. It therefore appears to the Court that the Defendant not only has a basic understanding of the law as it applies to him but he is well aware of the consequences of his failure to exercise his rights to remain silent and have a lawyer present. Secondly, the Defendant presently has an outstanding understanding of his Miranda rights as this Court could not imagine a better explanation of those rights and the meaning of them particularly when we are talking about an individual that has an eighth grade education and an I.Q. that suggests borderline verbal intelligence. It therefore becomes even more difficult for this Court to give credit to Dr. Fabian's testimony that, in his opinion, the Defendant would not have a significant ability at the time of questioning to fully appreciate his right to remain silent due to his suggestibility in an interrogation setting."
 {¶ 53} We agree with this analysis. Our review of the record, including the videotape of the interview, demonstrates that despite his borderline I.Q. and eighth-grade education, Mr. Bumgardner was able to answer questions in a competent manner and had little difficulty understanding what was asked of him. In fact, his comprehension ability was such that when the line of questioning turned its focus to his wife and he was asked if he thought that she had engaged in any sexual conduct with the children, he asked the lieutenant to "rephrase" the question. The fact that Mr. Bumgardner has a low I.Q. does not unequivocally mean that he is incapable of waiving his Miranda rights. In Collins, supra, the defendant had an even lower I.Q. of 76, was eighteen when he committed the offenses he was charged with, and graduated from *Page 16 
high school but read at a fourth grade level when in the ninth grade. In that case, we found that the defendant was capable of waiving his Miranda rights.
 {¶ 54} Mr. Bumgardner nevertheless argues that the state offered no rebuttal evidence in opposition to Dr. Fabian's expert opinion; thus, Dr. Fabian's opinion must stand. A close review of Dr. Fabian's written report and testimony at the suppression hearing reveals that his opinions and findings are tenuous at best. When asked whether he has an opinion as to whether Mr. Bumgardner intelligently waived his Miranda rights, Dr. Fabian did not unequivocally answer the question. Instead, Dr. Fabian, while acknowledging that Mr. Bumgardner's low I.Q. would affect his ability to appreciate the rights, concluded by stating:
 {¶ 55} "I believe that, you know, he has an ability currently to appreciate or at least understand. * * * Now, I don't think that, you know, Mr. Bumgardner, with his experiences here and throughout this situation, really appreciates the function of a right to silence * * * Overall, I think I would defer from making an overall decision. I think that's more of a legal opinion in this case that the judge needs to make."
 {¶ 56} Given the lack of a firm opinion, the trial court acted within its discretion in discounting Dr. Fabian's opinion. When the totality of the evidence is considered, we find that the trial court's findings that Mr. Bumgardner was capable of understanding the Miranda rights are supported by competent, credible evidence. In addition to Dr. Gazley's discussions with Mr. Bumgardner, which showed an understanding of the legal proceedings and his rights, the videotaped interview also demonstrated that Mr. Bumgardner was lucid, and when asked by the lieutenant on two occasions whether he read and understood the Miranda rights, Mr. Bumgardner applied affirmatively. While *Page 17 
this is indicative of a knowing waiver, we must still determine whether there was coercive police conduct, which would render the waiver of Miranda rights invalid.
 {¶ 57} Interrogation Conditions
 {¶ 58} Mr. Bumgardner argues that the interrogation conditions were stressful and confusing. He further argues that police tactics were coercive. Specifically, he points to the fact that the police initially told him he was under arrest but then presented him with a waiver form saying that he was not under arrest. Furthermore, he argues that he was told how to answer questions and was promised he would not go to prison.
 {¶ 59} "As a general proposition, a confession will be deemed voluntary when it stems from a free and unconstrained choice of its maker; on the other hand, a confession will be viewed as involuntary when it is caused by coercive police action." State v. Quigley, 11th Dist. No. 2004-G-2577, 2005-Ohio-5276, ¶ 34, citing State v.Worley, 11th Dist. No. 2001-T-0048, 2002-Ohio-4516. The totality of the circumstances must be considered in determining whether a statement is made voluntarily. State v. Pohl, 11th Dist. No. 2004-L-180,2006-Ohio-200, ¶ 18, citing State v. Young, 11th Dist. No. 2002-A-0093,2004-Ohio-342. Factors to consider include: "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." Id. at ¶ 19, citing Young at ¶ 11.
 {¶ 60} "There must be some evidence of coercion on the part of the police in order to trigger an analysis of the totality of the circumstances." Id. at ¶ 20. "As stated by the United States Supreme Court, `coercive police activity is a necessary predicate to the finding' that a suspect involuntarily waived his Miranda rights and voluntarily *Page 18 
confessed." Id., quoting Colorado v. Connelly (1986), 479 U.S. 157, 167. "Absent evidence that `[a suspect's] "will was overborne and his capacity for self-determination was critically impaired" because of coercive police conduct,' a suspect's decision to waive hisMiranda rights and confess will be deemed to be voluntary." Id., citingColorado v. Spring (1987), 479 U.S. 564, 574, quoting Culombe v.Connecticut (1961), 367 U.S. 568, 602.
 {¶ 61} A review of the videotape demonstrates no coercion on the part of the interrogating officer. There was no physical deprivation or mistreatment. Rather, when Mr. Bumgardner stated that he wanted coffee, one of the officers left the building to buy him a cup of coffee. He acknowledged that he was permitted a cigarette. Furthermore, on the videotape, Mr. Bumgardner denied any mistreatment. Moreover, the interrogation itself lasted only seventeen minutes with an additional twenty to twenty-five minutes of pre-interview discussions. Thus, the interrogation was relatively short in duration.
 {¶ 62} Subsequently, Mr. Bumgardner alleged that Lieutenant Bishop threatened him with prison if he did not tell him what he wanted to hear. He also said that the police stopped and started the tape recording and rewound the tape in order to record a confession. However, there is no evidence to support this position other than Mr. Bumgardner's statement to this effect. The officers denied these allegations. This is a matter of credibility. "[A]t a hearing on a motion to suppress, the trial court assumes the role of the trier of facts and, therefore, is in the best position to resolve questions of fact and evaluate the credibility of witnesses." State v. Jones, 11th Dist. No. 2003-T-0107, 2004-Ohio-6177, ¶ 11, quoting State v.Jones, 11th Dist. No. 2001-A-0041, 2002-Ohio-6569, ¶ 16; *Page 19 Mills at 366. Since the credibility of witnesses is a matter within the trier of fact's discretion, the trial court was free to find the officers' testimony more credible than that of Mr. Bumgardner's.
 {¶ 63} Moreover, after viewing the videotape, we find no evidence that the tape was stopped. Nor do we find any evidence of police coercion. In fact, if anything, Lieutenant Bishop used a non-threatening manner of interrogation when questioning Mr. Bumgardner.
 {¶ 64} We agree with the trial court, when it stated:
 {¶ 65} "The video recording is entirely devoid of any evidence that would suggest that Defendant was under any threat or intimidation by the police. Instead, the Defendant's demeanor throughout the interview clearly demonstrates that the Defendant was relaxed and comfortable. He can be seen sitting well back in his seats [sic], he is not handcuffed, he has a cup of coffee next to him, and he freely moves about in his chair throughout the interview. Furthermore, the Court finds that Defendant was never subjected to physical deprivation or mistreatment. He was also never subjected to improper inducement by police during his interrogation. Defendant's self-serving testimony at the suppression hearing that 1) he was told he was not under arrest, 2) he should just initial the Miranda rights, 3) tell the officers what they wanted to hear and he wouldn't go to prison, 4) the officers stopped and re-started the videotape three separate time [sic] because he [Defendant] didn't do it right, and 5) he asked for, and was denied, a lawyer, is incredible and belied by the videotape itself."
 {¶ 66} Based on the totality of the circumstances, we find that the statements Mr. Bumgardner provided to police were done so voluntarily, without police coercion, and *Page 20 
that he knowingly, intelligently, and voluntarily waived his Miranda rights. Appellant's assignment of error is overruled.
 {¶ 67} The judgment of the Trumbull County Court of Common Pleas is affirmed.
CYNTHIA WESTCOTT RICE, J., concurs
 COLLEEN MARY OTOOLE, J., concurs in judgment only. *Page 1